UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCOS MANSON ADAMS, | Case No.  2:21-cv-01733-DJC-JDP (HC) |
| Petitioner, | FINDINGS AND RECOMMENDATIONS |
| v. | ECF No. 1 |
| JEFF LYNCH, | OBJECTIONS DUE IN FOURTEEN DAYS |
| Respondent. | |

Petitioner Anthony Marcos Manson Adams seeks a writ of habeas corpus under 28 U.S.C. § 2254. ECF No. 1. He was convicted of shooting his girlfriend, Latesha Doe. His claims center on the admissibility of statements that Latesha gave to a responding officer and her roommate identifying him as the shooter. Respondent has answered the petition, ECF No. 16, and petitioner has declined to file a traverse. For the reasons stated below, I recommend that the petition be denied.

**Background**

I have reviewed the background summary provided by the state appellate court on direct appeal. It appears to be correct, and I reproduce it here:

> On the night of August 30, 2015, Dora Lopez was driving down Stockton Boulevard in Sacramento with her boyfriend, David Rodriguez, when a car backed out of an apartment complex and stopped in the middle of the street. Ms. Lopez brought her vehicle to a stop. A man and a woman came out into the street arguing. Ms. Lopez testified they were about 10 feet away; Mr. Rodriguez put the distance at 20 feet. The man yelled at a person in the car, which drove off. Ms. Lopez did not move because the man and woman were in the street. The man called the woman a name and she hit him in the face several times. The man drew a gun tucked into his belt, pointed it at the woman's head, and fired. The woman was facing the man, holding her hands in front of her like a shield. It appeared to Ms. Lopez and Mr. Rodriguez that the man shot the woman in the face. The woman screamed and fell to the ground. The man ran back into the apartment complex.
>
> Ms. Lopez drove off and called 911—at 9:51 p.m. according to the transcript of the call—and reported that a man had shot a woman on Stockton Boulevard. She told the 911 operator that the man and woman were "a black couple," the man was a "[b]lack guy with dreads," he was in his late 20's or early 30's, he was five feet eight inches or five feet nine inches tall, and he was stocky. The operator asked, "Which way did he go?" Ms. Lopez said, "I think he ... ran back into the apartments."
>
> Mr. Rodriguez testified at trial that the man's dreadlocks were a little past his shoulders. Mr. Rodriguez said that man was in his mid-30's or late 20's and five feet ten inches or maybe six feet tall. During the incident, the man and woman were facing each other, sideways to Mr. Rodriguez. Mr. Rodriguez testified that the man had multiple tattoos covering his arm, but it was too dark to make them out. The entire incident, from when the car pulled out in front of Ms. Lopez and Mr. Rodriguez to when they drove away, lasted about a minute.
>
> Latesha telephoned her roommate, Keela Cole, and asked her to come to the apartment complex on Stockton Avenue. Latesha was yelling on the phone and, when Ms. Cole arrived at the apartment complex five or 10 minutes later, Latesha was in front crying. Ms. Cole testified that Latesha said she had been shot and "He" shot her. Latesha did not give a name. A few minutes later, an ambulance arrived.
>
> Ms. Cole had seen defendant before together with Latesha "[a]s a couple," because defendant "was her boyfriend." On cross-examination, Ms. Cole testified that Latesha had several boyfriends in August 2015. Defendant and Latesha were "on their way" to not seeing each other anymore. They were more together in July 2015.

Sheriff's Deputy Anthony Archuletta was dispatched to the apartment complex on a report that a man had shot a woman. He arrived at about 10:00 p.m. Deputy Archuletta contacted Latesha, who was on a gurney in an ambulance. Latesha "was screaming in pain, just really distraught. Hysterical." She was not able to answer a question coherently. Deputy Archuletta was trying to determine what was happening at that point. He was not taking a formal statement; he was trying to figure out if a crime had occurred. Initially, the deputy was only able to get her name. When Latesha calmed down a bit, he asked her what happened and she said, "My boyfriend Marcos shot me."

Deputy Archuletta testified he had seen defendant before. In July 2015 defendant was in a car and had to release the car to someone. He released the car to Latesha. They shared a hug and a kiss as defendant was leaving.

The paramedic in the ambulance did not believe that Latesha had been shot. The wound did not look like a gunshot wound to Deputy Archuletta. Latesha was taken to the hospital to verify that she had not been shot. At the hospital, a doctor informed Deputy Archuletta that Latesha had been shot, as confirmed by a CT scan showing a small caliber bullet in her elbow.

On September 15, 2015, a detective interviewed Ms. Lopez and Mr. Rodriguez. The detective had prepared a photographic lineup of six photographs showing defendant plus five individuals with similar physical features. The photograph in the lower left-hand corner in the number four position was of defendant.

The detective showed the lineup separately to Ms. Lopez and Mr. Rodriguez. Ms. Lopez initialed the photograph in the number four position as the person who fired the firearm. She stated, "If anything it might have been him. But I'm not sure. 'Cause his hair wasn't short like that or anything."[1] Ms. Lopez indicated that she did not think the rest of the photos were the shooter.

Mr. Rodriguez initialed the photographs in the two and four positions.[2] He was not 100 percent positive that these photos were of the shooter. He testified he could not rule out those two, while he was sure the others were not the shooter.

At trial, Ms. Lopez confirmed that she had initialed the photographic lineup identifying the person she believed was responsible for the shooting. She also confirmed that the person she described in the 911 call had long dreadlocks to his shoulders. She testified, however, she did not see the person who fired the shot sitting in the courtroom. The court directed Ms. Lopez to look at defendant, who was wearing a white dress shirt and tie and seated at

---

[1] [Footnote 3 in original text] The photograph in position four of the photographic lineup showed an individual with dreadlocks to the shoulder. Photos in some of the other positions showed individuals with shorter dreadlocks.

[2] [Footnote 4 in original text] These individuals had dreadlocks to their shoulders.

the counsel table. Ms. Lopez stated she did not think that was the person. When the court asked what features about that person made her think he was not the shooter, Ms. Lopez stated, "Well, I mean it was three years ago. I just remember he had dreads and he was a little more stocky." Mr. Lopez testified that she picked the photograph in the lineup, because "[h]e looked more husky because from what I remember he was like a kind of a husky dude and he had dreads that were just like to the shoulder."

Mr. Rodriguez also stated at trial that he did not see the person who fired the shot in the courtroom. He confirmed that he had identified the person responsible for the shooting in the photographic lineup. He initialed the lineup in two places because the shooter was one of those two people and none of the others. The court asked Mr. Rodriguez if one of the photos he saw in the lineup was of "the gentleman in the white shirt and tie in court here today." Mr. Rodriguez stated, "[A]ll of them had dreadlocks as far as I remember that's the main description I remember. So I do not see dreadlocks on him unless you show me the photo again maybe I can see him without the dreadlocks maybe I'd be different." Mr. Rodriguez stated he would not be able to recognize the shooter if he saw him again, because dreadlocks were the main feature of the photographic lineup.

The prosecutor placed his fingers over the dreadlocks in the photograph in the four position to assist Mr. Rodriguez's recollection, and he testified that defendant at the counsel table "pretty much looked like him without the dreads." Between the two photographs Mr. Rodriguez initialed, he testified the one on the bottom left was more likely the person responsible for the shooting.

At trial, the detective who prepared the lineup also could not identify defendant in the courtroom as the person in position four, "because his appearance has changed such [sic] drastically."

The detective testified that he had difficulty contacting Latesha. When he met her, he observed a healed wound on her left arm next to the elbow. The detective showed her the photographic lineup. She appeared apprehensive and reluctant and abruptly left the interview.

Latesha appeared at trial. In proceedings outside the presence of the jury, Latesha stated to the court that she was reluctant to testify, understood that she had no right to refuse to testify, would not explain how she came to be shot even if the court held her in contempt and put her in jail for refusing to testify, stated she could not remember what happened, and confirmed that she was refusing to testify. Latesha was in custody on an unrelated matter when she appeared at trial and was represented by counsel. With the agreement of the prosecutor and defense counsel, the court so informed the jury when Latesha was on the witness stand, while admonishing jurors not to speculate why she was in custody.

With the jury present, the prosecutor asked Latesha three questions: (1) did she know the defendant, (2) was she shot on August 30,

>2015, and (3) was there any question that he could ask that she would answer. Latesha did not respond. At the trial judge's request, Latesha raised her left arm showing a mark above the elbow.
>
>The prosecution called David Cropp, who testified to his background working with families and children exposed to domestic violence, including formerly as a Sacramento police officer. Mr. Cropp testified he had qualified 18 times as an expert in the area of domestic violence and victim and witness participation. Mr. Cropp testified that it was very common in the criminal justice system for victims of domestic violence to refuse to cooperate with the prosecution or to change or recant their previous statements. The reasons for this behavior included reluctance to be adverse to a person who may be a co-parent or "somebody they may love." A victim also may fear retaliation, stalking, threats, being alone, being unable to support the children, and family or social judgments. Mr. Cropp had seen in the literature estimates that up to 80 percent of domestic abuse victims refuse to cooperate with law enforcement. Mr. Cropp confirmed that he knew nothing about this case, had not read any police reports on it, and did not know defendant.

ECF No. 11-14 at 2-6.

## Discussion

### I.   Legal Standards

A federal court may grant habeas relief when a petitioner shows that his custody violates federal law. *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75 (2000). Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition. *See Harrington v. Richter*, 562 U.S. 86, 97 (2011). To decide a § 2254 petition, a federal court examines the decision of the last state court that issued a reasoned opinion on petitioner's habeas claims. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *Van Lynn v. Farmon*, 347 F.3d 735, 738 (9th Cir. 2003) ("Because, here, neither the court of appeal nor the California Supreme Court issued a reasoned opinion on the merits of this claim, we look to the trial court's decision."); *McCormick v. Adams*, 621 F.3d 970, 975-76 (9th Cir. 2010) (reviewing the decision of the court of appeal, which was last reasoned decision of a state court); *Gill v. Ayers*, 342 F.3d 911, 917 n.5 (9th Cir. 2003) ("Because the California Supreme Court denied review of Gill's habeas petition without comment, we look through the unexplained California Supreme Court decision to the last reasoned decision . . . as

the basis for the state court's judgment.") (internal quotations omitted).

Under AEDPA, a petitioner may obtain relief on federal habeas claims that have been "adjudicated on the merits in state court proceedings" only if the state court's adjudication resulted in a decision (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

## II. Analysis

### A. Confrontation Clause Claim

Petitioner argues that his girlfriend's statement to Deputy Archuletta that "[m]y boyfriend Marcos shot me" violated his rights under the Sixth and Fourteenth Amendments because it was testimonial. The California Court of Appeal rejected this claim.

> Defendant contends that admitting Latesha's statement to Deputy Archuletta—"My boyfriend Marcos shot me"—violated his right to confront witnesses under the Sixth and Fourteenth Amendments, because the statement was "testimonial."
>
> We review this contention de novo. (*People v. Nelson* (2010) 190 Cal. App. 4th 1453, 1466 (*Nelson*).)
>
> The applicable law begins with *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177] (*Crawford*), in which the United States Supreme Court held that out-of-court "[t]estimonial statements of witnesses absent from trial [can be] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." (*Id.* at p. 59.) Latesha did not testify at trial and defendant had no opportunity to cross-examine her.[3] Accordingly, her statement to Deputy Archuletta is

---

[3][Footnote 5 in original text] We reject the Attorney General's assertion that Latesha was available for cross-examination because she appeared at court, even though she refused to answer any of the prosecutor's questions. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal. 4th 335, 413 ["the Crawford rule does not apply when the declarant testifies and is thus subject to cross-examination"].) As the Attorney General concedes, a witness who refuses to answer any questions denies a defendant a meaningful opportunity for cross-examination. (*Douglas v. Alabama* (1965) 380 U.S. 415, 419-20 [13 L.Ed.2d 934]; *People v. Giron-Chamul* (2016) 245 Cal. App. 4th 932, 965-966; *People v. Perez* (2016) 243 Cal. App. 4th 863, 886; *People v. Murillo* (2014) 231 Cal. App. 4th 448, 456; *People v. Rios* (1985) 163 Cal. App. 3d 852, 864-65.) The Attorney General suggests that a defendant must question a recalcitrant witness who has refused to answer the prosecutor's questions or forfeit a confrontation clause challenge on appeal. However, proceedings conducted outside the presence of the jury confirmed that Latesha would refuse to answer any questions put by the prosecutor or defense counsel. As noted,

admissible only if it was nontestimonial. (*Davis v. Washington* (2006) 547 U.S. 813, 821 [165 L.Ed.2d 224] (*Davis*).)

In *Davis*, the Supreme Court explained that a statement is nontestimonial "when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." (*Davis*, *supra*, 547 U.S. at p. 822.) A statement is testimonial "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to criminal prosecution. [Fn. omitted.]" (*Ibid*.) In the first of two companion cases in *Davis*, (case No. 05-5224) statements made by a domestic violence victim to a 911 operator identifying the defendant *Davis* as her assailant, and describing what he was doing during the call, were determined to be nontestimonial. (*Id.* at pp. 817-818, 828-829.)

In the companion domestic violence case, *Hammon v. Indiana* (case No. 05-5705) (*Hammon*) the Supreme Court found that there was no ongoing emergency where the victim appeared calm when encountered by police on the front porch of her home, but when questioned outside the defendant Hammon's presence said that he had thrown her down on broken glass and punched her in the chest. The court held these statements were made for the purpose of investigating a past crime, rather than to assist police in intervening in an emergency, and thus were barred by the confrontation clause. (*Davis*, *supra*, 547 U.S. at pp. 819-821, 829-830.)

In *People v. Cage* (2007) 40 Cal. 4th 965 (Cage), the California Supreme Court applied *Crawford*, *Davis*, and *Hammon* in a case where the defendant was convicted of aggravated assault for slashing her son's face with a glass shard. (*Id.* at pp. 970, 972; *People v. Kerley* (2018) 23 Cal. App. 5th 513, 548-549.) At the hospital, a police officer interviewed the victim in the emergency department and asked what had happened. (*Cage*, supra, at pp. 971-972.) The victim said that, during an argument, his mother pushed him and he fell on a glass-topped coffee table, breaking it. (*Id.* at p. 972.) His grandmother held him down and his mother slashed his face with a piece of the broken glass. (*Ibid*.) After he was released from the hospital, the victim gave a more detailed statement in a tape-recorded interview at the police station. (*Id.* at pp. 972-973.) The victim did not testify at trial. (*Id.* at p. 973.) The Supreme Court held that both statements to police were testimonial. (*Id.* at pp. 984-985.) "The incident leading to the injury had been over for more than an hour. The assailant was far away. The victim was in no danger of further assault by his mother." (*Kerley*, *supra*, 23 Cal. App. 5th at pp. 548-549; Cage, supra, 40 Cal. 4th at p. 985; compare *People v. Saracoglu* (2007) 152 Cal. App. 4th 1584, 1597-98 (*Saracoglu*) [the purpose of statements by the victim, who fled to police station, that her husband had

---

Latesha did not respond to the prosecutor's catch-all question whether there was any question she would answer.

7

assaulted and threatened to kill her if she went to police, were to gain police protection in an ongoing emergency].) The victim's statements to the surgeon in the emergency department about how the injury occurred were nontestimonial, because the surgeon's question was for the purpose of diagnosis and treatment, not to gather evidence for use at trial. (*Kerley*, *supra*, 23 Cal. App. 5th at p. 549; *Cage*, *supra*, 40 Cal. 4th at p. 986.)

*Cage* is inapposite here because the testimonial statements to police in that case were made after the victim was taken to the hospital. (*People v. Brenn* (2007) 152 Cal. App. 4th 166, 176 (*Brenn*).) *Cage* is nonetheless instructive because the Supreme Court emphasized that "the proper focus is not on the mere reasonable chance that an out-of-court statement might later be used in a criminal trial. Instead, we are concerned with statements, made with some formality, which, viewed objectively, are for the primary purpose of establishing or proving facts for possible use in a criminal trial." (*Cage*, *supra*, 40 Cal. 4th at p. 984, fn. 14; *Brenn*, *supra*, 152 Cal. App. 4th at p. 177.)

In *Michigan v. Bryant* (2011) 562 U.S. 344 [179 L.Ed.2d 93] (*Bryant*), police officers questioned a man found in a gas station parking lot bleeding from a gunshot wound. (*Id.* at p. 349.) The court held that the man's statements were not testimonial because an ongoing emergency had not been resolved, the scene was not secured, the shooter was at large, and the victim was in great distress (the wound ultimately proved fatal), which suggested his answers were not given for testimonial purposes. (*Id.* at p. 375.) The court noted that the questions were asked in a public area before emergency medical personnel arrived and were the type of questions (e.g., what happened?) that police need to ask to assess the threat to their own safety and danger to the victim and the public. (*Id.* at pp. 375-376.)

The distinguishing principle in *Davis*, *Hammon*, and *Bryant* is the primary purpose of the out-of-court statements. (*People v. Sanchez* (2016) 63 Cal. 4th 665, 689.) "Testimonial statements are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony. Nontestimonial statements are those whose primary purpose is to deal with an ongoing emergency or some other purpose unrelated to preserving facts for later use at trial." (*Ibid*.)

The court in Davis noted that the exigencies of assessing a domestic violence incident "may often mean that 'initial inquiries' produce nontestimonial statements." (*Davis*, *supra*, 547 U.S. at p. 832; *Bryant*, *supra*, 562 U.S. at p. 377; *see also Brenn*, *supra*, 152 Cal. App. 4th at p. 178 ["'Preliminary questions asked at the scene of a crime do not rise to the level of an "interrogation." Such unstructured interaction between officer and witness bears no resemblance to a formal or informal police inquiry that is required for a police "interrogation" as that term is used in *Crawford*. [Citations]'"]; *People v. Corella* (2004) 122 Cal. App. 4th 461, 469.)

8

Based on *Bryant*, the California Supreme Court in *People v. Blacksher* (2011) 52 Cal. 4th 769, 813-815, articulated six factors to consider in determining whether a hearsay statement is testimonial or nontestimonial, which the court in *People v. Chism* (2014) 58 Cal. 4th 1266 (*Chism*), summarized as follows: "(1) an objective evaluation of the circumstances of the encounter and the statements and actions of the individuals involved in the encounter; (2) whether the statements were made during an ongoing emergency or under circumstances that reasonably appeared to present an emergency, or were obtained for purposes other than for use by the prosecution at trial; (3) whether any actual or perceived emergency presented an ongoing threat to first responders or the public; (4) the declarant's medical condition; (5) whether the focus of the interrogation had shifted from addressing an ongoing emergency to obtaining evidence for trial; and (6) the informality of the statement and the circumstances under which it was obtained." (*Id.* at p. 1289.)

Applying these principles in *Chism*, the Supreme Court determined that the statements of a witness to a police officer describing a shooting at a liquor store were nontestimonial. (*Chism*, *supra*, 58 Cal. 4th at p. 1289.) The officer was the first on the scene, the encounter took place outside the liquor store where the shooting had recently occurred, the witness appeared very nervous and shaken up, and the officer reasonably believed that an armed suspect was at large and posed a threat to police officers and the public. (*Ibid.*)

In this instance, the trial court held an Evidence Code section 402 hearing to determine the admissibility of Latesha's statement. Deputy Archuletta testified consistent with his trial testimony but with some additional details. We review this testimony, as well, to apply the factors enumerated in *Chism*.

On arriving at the scene, Deputy Archuletta was doing a quick canvas of the area and potential witnesses until another deputy informed him over the radio that the victim had been located in an ambulance. Two other deputies who arrived at about the same time as Deputy Archuletta had already spoken to Latesha. The information Deputy Archuletta had up to that point was that some people driving by had witnessed "a female on the ground and a male possibly shooter." Deputy Archuletta did not know who the suspect or the victim was.

When Deputy Archuletta spoke to Latesha, she was in so much pain and screaming so loudly that she could not focus on his questions. She was screaming "it hurts, it hurts, it hurts." Deputy Archuletta was confused because the paramedic said Latesha had not been shot. The deputy saw a small hole in Latesha's elbow almost like she fell on a pebble. She wasn't actively bleeding.[4]

---

[4] [Footnote 6 in original text] When another deputy found shell casings, Deputy Archuletta decided to go to the hospital for a follow-up.

9

Deputy Archuletta "asked her what happened. And that's when she had made the statement her boyfriend Marcos shot her." Deputy Archuletta testified, "At that time we didn't—we had no idea what had happened. If she had been shot, if she'd not been shot. I was under the impression she had not since fire personnel was there and I already assessed her and [the paramedic] said no she hadn't been shot. So at this point we're kind of confused about what actually occurred or what's going on."

Asked by the court to reconstruct the conversation, Deputy Archuletta testified: "So initially I was trying to get a base of information. You know name, date of birth, address, telephone number. So just from the initial contact just getting her name was difficult. I said, you know, what's your name. And she would, you know, try to tell me her first name but it was very, you know—she was crying and sobbing so hard it was hard to understand what she was saying. [¶] And then as I continued to question her just about the basic information I was able to get, you know, her—just her basic quick information. And then I said, can you tell me what happened. And you could tell she was becoming frustrated with the pain and sobbing and she just yelled out, 'My boyfriend, Marcos, shot me.' And that was all she really verbalized at that point."

Deputy Archuletta did not ask Latesha for details of the incident because the ambulance was about to leave to take her to the hospital. He testified that the whole interaction in the ambulance took "maybe two minutes."

The court ruled that "the officer at the time he asked that question was . . . attempt[ing] to resolve in his mind whether he was there investigating a crime or an accident or something else [because he] had been told by the paramedic that [he] didn't think she was even a gunshot victim. [¶] So asking the question what happened is not calculated to produce testimonial evidence and based on the evidence in front of me the response was non-testimonial."

Applying the factors summarized in *Chism*, we conclude that Latesha's statement to Deputy Archuletta was not testimonial and its admission did not violate defendant's Sixth Amendment rights.

First, viewed objectively, Deputy Archuletta was attempting to ascertain at the scene what had occurred after receiving a report that a man had shot a woman, including whether a crime had actually occurred, given that the paramedic in the ambulance did not think that Latesha had been shot. Latesha was hysterical, crying and complaining of great pain, indicating that she had been shot, but also making it difficult for the deputy to obtain basic information. When Deputy Archuletta asked what happened, the primary purpose of the question was to find out exactly that, in a confusing situation. The purpose of Latesha's answer was to tell him the cause of the pain she was plainly experiencing. Neither Deputy Archuletta nor Latesha sought to establish past events for use at trial.

> Second, as noted, the statement was obtained for a purpose other than for the prosecution to use at trial, i.e., to find out what happened and whether a crime had occurred. But there was also an ongoing emergency: an unidentified person was armed with a gun and his location was unknown. In *Bryant*, the Supreme Court reasoned that "what happened?" is the exact question that police officers would pose to a victim at the scene to assess the situation, the threat to their safety, and possible danger to the victim and the public. (*Bryant*, *supra*, 562 U.S. at p. 375.) Such information is solicited to enable police to meet an ongoing emergency. (*Id.* at p. 376.)
>
> Third, there was an ongoing threat to first responders and the public. Ms. Lopez told the 911 operator that defendant had run back into the apartment complex after shooting a woman in the street. Although Latesha was no longer in any apparent danger, the situation remained fluid as emergency personnel arrived on scene and there was still a possibility that the shooter still posed a threat. (*Nelson*, *supra*, 190 Cal. App. 4th at p. 1467.)
>
> Fourth, notwithstanding the skepticism of a paramedic in the ambulance, Latesha had been shot minutes before and was in such severe pain and distress that Deputy Archuletta had trouble obtaining and understanding her answers to basic questions.
>
> Fifth, in a two-minute interaction, there was no time for Deputy Archuletta to shift from addressing the immediate situation to obtaining evidence for trial.
>
> Sixth, not only did Deputy Archuletta testify that the circumstances were informal, Latesha was in an ambulance complaining of severe pain from a gunshot wound. A reasonable person would not construe her statement "as a solemn declaration that could lead to criminal charges if it was deliberately fabricated." (*Nelson*, *supra*, 190 Cal. App. 4th at p. 1467.)
>
> The circumstances here consisted of a two-minute exchange between a sheriff's deputy and a possible gunshot victim in great pain and distress in the back of an ambulance about a possible shooting by an as-yet unidentified shooter who had fled the scene minutes before. The deputy's question was directed at no more than finding out what had occurred, which led to information on the basic question of identity. There was no violation of the confrontation clause in admitting Latesha's statement that it was defendant who shot her.

ECF No. 11-14 at 6-12. The California Supreme Court issued a summary denial. ECF No. 11-16.

The California court of appeal's determination was not an unreasonable application of clearly established federal law. It bears re-emphasizing that, pursuant to the Supreme Court's holding in *Davis v. Washington*, "[s]tatements are nontestimonial when made in the course of

11

police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." 547 U.S. 813, 822 (2006). As the state court noted, Deputy Archuletta's interrogation of Latesha was for the purpose of resolving the ongoing law enforcement emergency: she was screaming in pain and her assailant was still at large. At a minimum, the state court's holding, correct or not, was not unreasonable, and that forecloses relief under AEDPA. *See Williams v. Taylor*, 529 U.S. 362, 411 (2000) ("[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.").

### B. Spontaneous Statement Claim

Next, petitioner alleges that his constitutional rights were violated when the trial court ruled that Latesha's statement was admissible as a spontaneous declaration. The California court of appeal rejected this claim as well, reasoning that the trial court did not misapply state law. ECF No. 11-14 at 12-14. The California Supreme Court did so as well in its summary denial of the petition for review. ECF No. 11-16. As an initial matter, no federal habeas relief may lie for an error of state law, and I am not empowered to second guess the state court's finding that the statement as a spontaneous declaration. *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999) ("A federal court, of course, cannot review questions of state evidence law."). And, as noted above, I have already determined that the state court's finding that the statement was non-testimonial was not unreasonable. This claim should also be denied.

### C. Latesha's Identification of Defendant to Keela Cole

Latesha phoned her roommate, Keela Cole, immediately after the incident. As noted above, Cole arrived at the scene ten minutes later, and Latesha told her that "he" shot her. Cole later testified at trial as to Latesha's utterance. Petitioner argues that the trial court erred in admitting Cole's testimony as a spontaneous statement. The California court of appeal rejected this claim in a reasoned decision.

> Defendant asserts that the trial court improperly admitted Ms. Cole's testimony that Latesha said that "He" shot her as a spontaneous statement.

12

> The trial reasoned: "It's within minutes—about 10 minutes of being shot. She was under the stress of excitement. I'm considering as well the description by the officer of Latesha's condition when he saw her and the fact she was being transported in an ambulance moments after she must have made this statement to Keela."
>
> Defendant incorporates the arguments regarding reflection and deliberation that he offered in support of the contention that Latesha's statement to Deputy Archuletta was improperly admitted under Evidence Code section 1240. If anything, however, Latesha's statement to Ms. Cole qualifies even more as a spontaneous statement than Latesha's answer to Deputy Archuletta's question. The statement to Ms. Cole is closer to the time Latesha was shot. (*Merriman*, *supra*, 60 Cal. 4th at p. 66.) Ms. Cole described Latesha on the telephone asking her to come to the apartment complex as "yelling." Latesha was crying and upset when Ms. Cole arrived. (*Ibid.* [exception applied where victim was "upset and angry" when she described choking incident to friend].) Ms. Cole did not testify that she questioned Latesha but rather that Latesha told her that "she got shot" and "He" shot her. (*Id.* at p. 64 ["whether the declarant blurted out the statement or made it in response to questioning" is a factor in admitting testimony as a spontaneous statement].)
>
> The trial court did not abuse its discretion in admitting Ms. Cole's testimony that Latesha said "He" shot her as a spontaneous statement.

ECF No. 11-14 at 14-15. As noted above, the California Supreme Court issued a summary denial. ECF No. 11-16.

I cannot second-guess questions of state law. And, under Supreme Court precedent, Latesha's statement to Cole was not testimonial. In *Crawford v. Washington*, the Supreme Court described the contours of testimonial statements and offered examples:

> [E]x parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially, . . . extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions, . . . [and] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]

541 U.S. 36, 51-52 (2004) (citations omitted). Latesha's statement to Cole, made almost immediately after the incident, while she was still in pain, and before she was transported to the

13

hospital does not remotely approach any of the categories laid out in *Crawford*, and petitioner's rights under the Confrontation Clause were not violated by its admission.

### D. Prosecutorial Misconduct and Ineffective Assistance of Counsel

Finally, petitioner argues that the prosecutor committed misconduct when, as a follow up to Cole's testimony, they asked "[f]rom your understanding when she told you that she was shot by her boyfriend you understood her to mean by [petitioner]?" Cole responded in the affirmative. He also argues that his counsel rendered ineffective assistance in failing to object to the question or request an admonition. The court of appeal denied this claim in a reasoned decision:

> Defendant contends that the prosecutor committed misconduct by following up on Ms. Cole's testimony with this question: "From your understanding when she told you that she was shot by her boyfriend you understood her to mean by [defendant]?" Ms. Cole responded, "Yeah."
>
> Defendant's claim is that the prosecutor improperly assumed facts not in evidence by referring to the shooter as Latesha's "boyfriend," when Ms. Cole testified that Latesha identified him only as "He" and did not name him.
>
> To be sure, the prosecutor's question did assume facts not in evidence. But any misconduct was de minimis. (*Cf. People v. Osband* (1996) 13 Cal. 4th 622, 695.) After testifying that Latesha said "He" shot her, Ms. Cole testified that she had seen Latesha and defendant "[a]s a couple," because defendant "was her boyfriend." The jury could draw a reasonable inference that, when Latesha referred to "He," Ms. Cole would know Latesha was referring to defendant as her boyfriend.
>
> Defendant nonetheless argues that the admission of Ms. Cole's apparent confirmation that Latesha was shot by her boyfriend, combined with "Latesha's erroneously admitted statement to Deputy Archuletta," violated due process by convincing the jury that defendant was the shooter. We have concluded that Latesha's statement to Deputy Archuletta was properly admitted. In light of that statement, in which the victim specifically identified defendant by name as the shooter, defendant could not have suffered any significant prejudice from the prosecutor eliciting Ms. Cole's testimony purportedly confirming that Latesha said her "boyfriend" shot her.
>
> Further, defendant concedes that, at trial, his counsel "did not object on the basis of misconduct or request an admonition" regarding the prosecutor's question or Ms. Cole's answer. Defendant argues that, if defense counsel forfeited the issue in failing to object, "then defense counsel necessarily rendered ineffective assistance of counsel." Defendant is correct that this issue was forfeited on appeal due to counsel's failure to object. (*People v. Fuiava* (2012)

14

> 53 Cal. 4th 622, 687; *People v. Collins* (2010) 49 Cal. 4th 175, 198.) But he has failed to establish ineffective assistance of counsel.
>
> Under the United States and California Constitutions, a criminal defendant has a right to effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Strickland v. Washington* (1984) 466 U.S. 668, 686 [80 L.Ed.2d 674] (*Strickland*); *People v. Ledesma* (1987) 43 Cal. 3d 171, 215 (*Ledesma*).) To establish ineffective assistance of counsel, defendant must show both that (1) his trial counsel's performance was deficient in that it fell below an objective standard of reasonableness, and (2) counsel's performance prejudiced him such that it is reasonably probable defendant would have obtained a better result but for counsel's deficiencies. (*Strickland*, *supra*, at pp. 689-694; *Ledesma*, *supra*, at pp. 216-218.)
>
> Unless defendant establishes to the contrary, we presume trial counsel's performance is within the wide range of professional competence and counsel's action or inaction can be explained as matter of sound strategy. (*People v. Centeno* (2014) 60 Cal. 4th 659, 674-675 (*Centeno*).) Where, as here, the record on appeal sheds no light on why trial counsel failed to act in the manner defendant now challenges, defendant must show there was no conceivable tactical purpose for counsel's act or omission. (*Ibid.*; *People v. Cunningham* (2001) 25 Cal. 4th 926, 1003 (*Cunningham*).) This is particularly so where the claimed deficiency is failure to object, because the decision to object or not is inherently tactical, and failure to object rarely establishes ineffective assistance of counsel. (*People v. Salcido* (2008) 44 Cal. 4th 93, 172.)
>
> Defendant has failed to prove that this is the rare circumstance where defense counsel could have no tactical reason for failing to object. To the contrary, if defense counsel had objected, the prosecutor could have questioned Ms. Cole further about Latesha's relationship with defendant, which led Ms. Cole to believe that by saying "He" Latesha meant a boyfriend and that boyfriend was defendant. As it stood, Ms. Cole had testified only to her assumption about what Latesha meant. Ms. Cole's testimony was undermined by her concession that she assumed Latesha meant defendant—who Ms. Cole did not recognize at trial—simply because he was sitting in the courtroom. By deciding not to object, defense counsel avoided potentially unfavorable evidence. This tactic paid off when Ms. Cole subsequently testified on cross-examination that Latesha had a number of boyfriends at time of the shooting in August 2015 and that she and defendant appeared to have broken up, testimony that defense counsel highlighted in closing argument.

ECF No. 11-14 at 15-16. As with the other claims, these were rejected by the California Supreme Court in a summary denial. ECF No. 11-16.

Rejection of both claims was reasonable. To warrant habeas relief, a petitioner must show

that the challenged prosecutorial misconduct rendered his trial fundamentally unfair. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). As noted by the state appellate court, Latesha's identification of the shooter was already accomplished by the admitted statement she gave to Deputy Archuletta that identified petitioner by name. Thus, even if the prosecutor's question and the answer it elicited were improper, petitioner cannot show that they reasonably altered the outcome of his trial. This finding also forecloses an ineffective assistance of counsel claim based on a failure to object to or request and admonition for the prosecutor's exchange with Cole. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984) ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

## Conclusion

Accordingly, it is RECOMMENDED that the petition, ECF No. 1, be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   July 17, 2023

JEREMY D. PETERSON
UNITED STATES MAGISTRATE JUDGE